# Illinois Official Reports

## Appellate Court

---

### *People v. Jones*, 2019 IL App (1st) 170478

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTHONY JONES, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>No. 1-17-0478 |
| Filed<br>Rehearing denied | November 21, 2019<br>December 23, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 15-CR-9509; the Hon. James B. Linn, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Bryon M. Reina, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Hareena Meghani-Wakely, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE REYES delivered the judgment of the court, with opinion.<br>Justices McBride and Burke concurred in the judgment and opinion. |

¶ 1      Following a bench trial, defendant Anthony Jones was found guilty of eight weapons-related charges, including armed habitual criminal (720 ILCS 5/24-1.7(a) (West 2014)). The court merged all counts into the armed habitual criminal count and sentenced defendant to seven years in prison on that count. On appeal, defendant contends his convictions on all charges should be reversed because the State did not prove that he possessed the firearm recovered by a police officer. He further argues his statement to a second officer that he possessed a firearm was insufficient to establish the *corpus delicti* of the offenses. In addition, defendant contends his case should be remanded for an inquiry into his counsel's effectiveness pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984). He also asserts his sentence is excessive in light of the nonviolent circumstances of the offense, his lack of a violent criminal history, and his rehabilitative potential. We affirm.

¶ 2      Following a police foot pursuit on May 23, 2015, defendant was charged with being an armed habitual criminal (720 ILCS 5/24-1.7(a) (West 2014)). The State also charged defendant with two counts of unlawful use of a weapon by a felon (*id.* § 24-1.1(a)), four counts of aggravated unlawful use of a weapon (*id.* § 24-1.6(a)(1), (2)), and one count of defacing the identification marks of a firearm (*id.* § 24-5(b)).

¶ 3      At trial, Chicago police officer Garcia testified that at about 11 p.m. on May 23, 2015, he and his partner, Officer Caro, responded to a call of a person with a firearm in the area of Madison Street and Whipple Street.[1] Garcia saw defendant, whom he identified in court, walking on the sidewalk on Whipple Street wearing the clothing that was described in the police dispatch. Between 5 and 15 other people were also nearby.

¶ 4      Garcia stopped his vehicle and got out. Defendant continued to walk north on Whipple. Garcia announced his office and shouted "hey" to defendant. Defendant turned, looked at Garcia, and ran. Garcia ran after defendant. He estimated he was 15 feet behind defendant and was gaining on defendant as they ran.

¶ 5      Garcia followed defendant when defendant turned right and ran east on Madison. He saw defendant's hand "come up towards his waistband area at which time I observed his left hand *** toss a[n] unknown black object that made a metallic noise" when it hit the ground. Garcia could not see what the black object was but said it made a "[l]ike a clunking noise." Garcia pursued defendant on Madison and then south onto South Sacramento Boulevard.

¶ 6      Defendant was detained on Sacramento, where several officers had assembled. Garcia told Officer Catalano that, after pursuing defendant onto Madison, he saw defendant discard an item that made a metallic noise when it hit the ground. Catalano left immediately. As Garcia retraced the path of the foot chase, he saw Catalano standing over a blue steel Taurus semiautomatic pistol on the ground near where Garcia had seen defendant discard the unknown object. Garcia said the firearm was spotted by Catalano within "seconds" of defendant's detention. Catalano recovered and inventoried the firearm.

¶ 7      Defendant was advised of his *Miranda* rights and taken to the Eleventh District police station, where Garcia and Caro interviewed him. Garcia asked defendant why he ran.

---

[1]No first name for any of the officers was given at trial.

Defendant responded he had seen a firearm on the ground and picked it up, and ran because he did not want to get caught with it.

¶ 8 On cross-examination, Garcia said that when he initially saw defendant on the sidewalk, he did not see anything in defendant's hands. The other people with defendant scattered, some in the same direction as defendant. During the pursuit, Garcia did not send a radio message to other officers about the object discarded by defendant. It took Garcia between 30 and 45 seconds to walk from where defendant was detained back to Madison. There was a "busy" grocery store "next to" where the firearm was recovered on Madison. Garcia had not seen where the object landed when defendant threw it. Defendant's statement was not memorialized but was documented in the police case report. Garcia did not ask defendant to identify the recovered firearm or "anything about the firearm." On redirect, Garcia said he could not recall if other people were in the area of Madison and Whipple when defendant discarded the object.

¶ 9 Catalano testified that when he arrived at Sacramento, Garcia was placing handcuffs on defendant. After speaking with Garcia, Catalano went to the area of Madison and Whipple and, within 30 seconds, recovered a blue steel, 9-millimeter Taurus firearm loaded with eight live rounds. The weapon's serial number had been defaced.

¶ 10 On cross-examination, Catalano stated there was a grocery store near where he recovered the firearm. He did not recall if anyone was walking near the store. He recovered the firearm in the street, a foot from the curb. On redirect, he stated no other objects were on the street or sidewalk where the firearm was recovered.

¶ 11 The parties stipulated that defendant previously was convicted of possession of methamphetamine in case No. 09-CR-051701 and convicted of the manufacture and delivery of a controlled substance in case No. 06-CR-1231501. They also stipulated that he did not have a concealed carry license or a firearm owner's identification (FOID) card on the day of this offense.

¶ 12 For the defense, Tarrina Covington testified he had known defendant for 10 years. On the night of May 23, 2015, Covington picked up defendant and defendant's cousin, Eric Jones, and drove them all to Madison and Whipple. Covington remained in his car while defendant got out and talked to some friends. About 10 or 15 people were nearby. When a police car drove up, defendant and several other people walked north on Whipple toward Madison. Covington did not see defendant hold a firearm or carry a firearm in his waistband or see defendant reach the intersection of Madison and Whipple.

¶ 13 Defendant testified he and Jones were talking to a group of people at Madison and Whipple after Covington drove them there. When the police drove up, people threw bottles and cups of alcohol to the ground and started to walk away. Defendant "walked off with the crowd," and when a police officer said "stop right there or something, hey, come here *** everybody scattered off running, everybody went separate ways."

¶ 14 Defendant said he ran across Madison and turned left and was eventually detained by police at Albany Avenue. He denied having a firearm, running right on Madison to Sacramento, or throwing any object onto the ground. He also denied telling a police officer that he picked up a weapon from the sidewalk. On cross-examination, defendant said he spoke with Garcia at the police station but told the officer it was not his firearm. Defendant denied telling Garcia he ran to avoid being caught with a weapon.

¶ 15 In rebuttal, the State entered a stipulation that defendant had a prior felony conviction for possession of a controlled substance in case No. 06-CR-972401.

¶ 16 At the close of evidence, the trial court stated:

> "All right. [The] court did hear the evidence. There are some credibility issues to be resolved. There were people on the street, started to run, detracted officers' attention. They were in pursuit and saw Mr. Jones—Officer Garcia saw Mr. Jones throw something and heard something metallic, kept going, and finally detained Mr. Jones. Officer Catalano was right there on the spot. Officer Garcia told him he found a firearm right where it was supposed to be. And there was reference [*sic*] from Mr. Jones admitted having that firearm and tossing it, according to police. He says he never saw [*sic*] that. I find the police by far more credible and compelling than him.
>
> There will be a finding of guilty as charged."

¶ 17 The court merged all counts into the armed habitual criminal count.

¶ 18 Defense counsel filed a motion for reconsideration of the court's findings or, alternatively, for a new trial. The motion asserted, along with eight other points, that "defendant was denied effective assistance of counsel" but did not elaborate on the claim. At the hearing on the motion, at which defendant was present, defense counsel argued the evidence did not show that defendant possessed a weapon but did not raise the ineffective assistance claim. The court denied the motion.

¶ 19 A presentence investigation report was prepared. At sentencing, the State argued in aggravation that defendant had prior adult convictions for possession of methamphetamine and delivery and possession of a controlled substance. In mitigation, defense counsel requested a minimum sentence, arguing defendant had no prior weapons-related arrests or convictions and no history of arrests "with respect to crimes of violence." Counsel also noted defendant's qualifying narcotics convictions under the armed habitual criminal statute were from 2006 and 2009. In addition, counsel asserted that defendant had "strong family support" with his relatives present in court and had been employed at a car wash during the pendency of his case. Counsel also noted defendant had not incurred additional charges during this case. Defendant addressed the court in allocution, apologizing and asking to be with his children and family.

¶ 20 In imposing a seven-year term, the court noted defendant's "background was narcotics-related." The court observed defendant could receive up to 30 years in prison but found a shorter sentence appropriate, noting that defendant would serve 85% of his term.

¶ 21 Defendant filed a motion to reconsider sentence, asserting, *inter alia*, that his sentence was excessive and the trial court failed to consider mitigating factors. The trial court denied that motion, and defendant now appeals.

¶ 22 Defendant first contends the evidence was insufficient to prove his guilt beyond a reasonable doubt because he was not seen in possession of a firearm, no physical evidence linked him to the firearm, the firearm was recovered from a "heavily trafficked" area over which he had no control, and Garcia's testimony that defendant admitted the firearm was his was not credible. Thus, defendant argues, the State did not prove he had actual possession of the weapon that Catalano recovered from the sidewalk. He further argues the State failed to prove the necessary *corpus delicti* because the only evidence that he possessed the firearm was his unmemorialized statement to Garcia.

¶ 23 Before addressing defendant's arguments, we note that he frames his contentions regarding the sufficiency of the evidence as a challenge to his "convictions" on all eight charged counts. The record reflects that, in finding defendant guilty, the trial court merged all counts into the armed habitual criminal count and imposed sentence on that count only. Further, defendant's notice of appeal lists only the armed habitual criminal offense.

¶ 24 Defendant acknowledges that, as a general rule, a judgment of guilty on an unsentenced count cannot be appealed. However, he maintains such an appeal can be taken where the appeal is "from the final judgment of another offense," citing *People v. Scott*, 69 Ill. 2d 85, 88 (1977). The State does not address the issue but confines its reasonable doubt argument to the offense of armed habitual criminal. In *People v. Caballero*, 102 Ill. 2d 23, 51 (1984), our supreme court held a defendant may only appeal convictions for which a sentence has been imposed. See *People v. Fort*, 2019 IL App (1st) 170644, ¶ 37; *People v. Olaska*, 2017 IL App (2d) 150567, ¶¶ 112-15 (following *Caballero* over *Scott* and restricting its review to the convictions on which the defendant was sentenced, and noting the content of the defendant's notice of appeal). Accordingly, we have no jurisdiction to decide the validity of unsentenced offenses. See *People v. Relerford*, 2017 IL 121094, ¶¶ 74-75. We address defendant's arguments only as they relate to his sentenced armed habitual criminal conviction.

¶ 25 When a defendant challenges the sufficiency of the evidence to sustain a conviction, this court must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the offense were established beyond a reasonable doubt. *People v. Brown*, 2013 IL 114196, ¶ 48 (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). That standard applies whether the evidence is direct or circumstantial and does not allow this court to substitute its judgment for that of the trier of fact on issues that involve the credibility of the witnesses and the weight of the evidence. *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009); *People v. Thigpen*, 2017 IL App (1st) 153151, ¶ 21. Moreover, when proving each element of a criminal offense beyond a reasonable doubt, the State must establish that (1) a crime was committed, also known as the *corpus delicti*, and (2) the crime was committed by the defendant. *People v. Pitts*, 2016 IL App (1st) 132205, ¶ 31. This court will not reverse a criminal conviction based on the insufficiency of the evidence unless the evidence is so improbable or unsatisfactory that a reasonable doubt exists as to the defendant's guilt. *People v. Beauchamp*, 241 Ill. 2d 1, 8 (2011).

¶ 26 To convict defendant for being an armed habitual criminal as charged, the State was required to prove beyond a reasonable doubt that defendant (1) possessed a firearm and (2) had been convicted two or more times of certain offenses as enumerated in the statute. 720 ILCS 5/24-1.7(a) (West 2014). The parties stipulated that defendant had prior convictions for two qualifying offenses. Defendant does not contest that the convictions satisfy the statutory elements or that the recovered weapon was a firearm. He only argues the State failed to prove he possessed the recovered firearm.

¶ 27 Whether a defendant had possession of contraband is a factual issue, and this court will not disturb the findings of the trial court, which was the trier of fact in this bench trial, unless the evidence is so unbelievable that it creates a reasonable doubt as to the defendant's guilt. *People v. Miller*, 2018 IL App (1st) 152967, ¶ 11. Possession of a firearm can be either actual or constructive. *People v. Dismuke*, 2017 IL App (2d) 141203, ¶ 44. Actual possession is proved by testimony that the defendant exercised some form of dominion over the firearm, such as that he had it on his person, tried to conceal it, or was seen to discard it. *Miller*, 2018 IL App

- 5 -

(1st) 152967, ¶ 9; *People v. Anderson*, 2018 IL App (4th) 160037, ¶¶ 31-32. To establish constructive possession, the State must prove that the defendant had knowledge of the presence of the firearm and exercised immediate and exclusive control over the area where the firearm was found. *People v. McCurine*, 2019 IL App (1st) 160817, ¶ 22.

¶ 28 We find the evidence sufficient to show defendant was in actual possession of a firearm. Defendant told Garcia at the police station that he picked a gun up from the ground and ran from police because he did not want to get caught with it, thus establishing his possession of a firearm. Defendant argues that Garcia's testimony regarding his unmemorialized statement was incredible. Defendant asserts Garcia did not testify that he saw defendant pick up a firearm "even though Garcia was watching [defendant] when this supposedly happened." Defendant's argument is without merit because Garcia testified that defendant *discarded* a weapon. It was only defendant who testified he picked one up. Moreover, defendant did not specify when he picked up the firearm, so there is no basis to claim that Garcia would have seen him do it. Further, in reviewing the sufficiency of the evidence, this court gives great deference to the findings of the trial court regarding the credibility of witnesses. See *People v. Little*, 2018 IL App (1st) 151954, ¶ 36. Here, after summarizing the evidence, the trial court found the police testimony "more credible and compelling" than defendant's testimony. We defer to that credibility determination. See *id.*

¶ 29 As defendant points out, a defendant's admission or confession alone cannot prove the *corpus delicti*; rather, such a statement by the defendant must be accompanied by corroborating evidence that is independent of the statement. *People v. Lara*, 2012 IL 112370, ¶ 17. The corroborating evidence does not have to prove the defendant guilty of the crime beyond a reasonable doubt but must " 'tend[ ] to' " connect the defendant with the crime. (Internal quotation marks omitted.) *Pitts*, 2016 IL App (1st) 132205, ¶ 31 (quoting *People v. Perfecto*, 26 Ill. 2d 228, 229 (1962)). Here, defendant's conviction was not solely based on his statement to Garcia but was corroborated by evidence connecting defendant to the firearm recovered by Catalano.

¶ 30 Garcia testified that while pursuing defendant on foot, he saw defendant reach into his "waistband area" and toss a black object to the sidewalk. Garcia was within 15 feet of defendant and heard the object make a metallic noise or a "clunking" noise when it hit the ground at Madison and Whipple. When defendant was detained shortly thereafter, Garcia reported those facts to Catalano. Catalano immediately went to Madison and Whipple and, within 30 seconds, found the firearm in the street a foot from the curb. He saw no other object on the street or sidewalk there. When Garcia walked back to where he saw defendant discard the object, he saw Catalano standing over the firearm. The officers' testimony tends to connect defendant to the firearm recovered on Madison, a firearm he threw away as he ran, thus corroborating his admission to Garcia that he ran from police after picking up a gun that he did not want to be caught carrying. Therefore, defendant's statement, coupled with the independent evidence provided in the officers' testimony, established that defendant was in possession of a firearm and was guilty of being an armed habitual criminal.

¶ 31 We note that, even without defendant's statement, the above-cited testimony is sufficient to show defendant's constructive possession of the firearm, where Garcia saw defendant discard an object and Catalano shortly thereafter recovered a firearm in the same location. Defendant contends it was "highly improbable" that Garcia would not have noticed additional details about the firearm during the chase, such as where it was located and what it looked like.

- 6 -

However, Garcia testified he was running after defendant when he saw defendant discard an "object." It is entirely reasonable that Garcia would not have noticed the exact location where that object landed or what exactly the object was while he ran.

¶ 32 Defendant also claims the recovered firearm could have been discarded by one of the other people in the area at the time, where it was found in front of a busy store and he had not been the only person running from police in that direction. Defendant's theory would have required the trial court to find that defendant happened to discard a black object in the same location as the blue steel pistol recovered shortly after he was seen throwing that object, in an area where no other objects were found on the street or sidewalk. The trier of fact is not required to disregard the inferences that flow from the evidence or search out all possible explanations consistent with a defendant's innocence and raise them to the level of reasonable doubt. *Miller*, 2018 IL App (1st) 152967, ¶ 11. From the testimony presented at trial, the court could conclude, as the trier of fact, that the weapon recovered by Catalano was the item that Garcia saw defendant discard. In sum, the evidence was sufficient to show defendant possessed a firearm and thus was guilty of being an armed habitual criminal beyond a reasonable doubt.

¶ 33 Defendant next contends this case should be remanded for the trial court to conduct a *Krankel* inquiry into the ineffective assistance claim included in his counsel's posttrial motion. The State responds no such process was required because defendant did not make a *pro se* claim regarding counsel's representation.

¶ 34 Defendant was represented at trial and in posttrial proceedings by retained counsel. Following defendant's bench trial, counsel filed a motion for reconsideration of the court's findings or, alternatively, for a new trial. The motion listed nine claims, the last of which baldly stated, without elaboration: "The defendant was denied effective assistance of counsel." At the hearing on the motion, neither defense counsel nor the court referred to that specific contention. Defendant was present in court but did not complain to the court about his representation.

¶ 35 Defendant now argues the inclusion of that claim in his counsel's motion was sufficient to trigger a *Krankel* inquiry. *Krankel* and subsequent cases establish a two-step procedure for the trial court to undertake when a defendant has raised a *pro se* posttrial claim of counsel's ineffective assistance. A *Krankel* proceeding "serves the narrow purpose of allowing the trial court to decide whether to appoint independent counsel to argue a defendant's *pro se* posttrial ineffective assistance claims." *People v. Patrick*, 2011 IL 111666, ¶ 39. The goal of the proceeding is to "facilitate the trial court's full consideration of a defendant's *pro se* claim [of ineffective assistance of counsel] and thereby potentially limit issues on appeal." *People v. Ayres*, 2017 IL 120071, ¶ 13.

¶ 36 First, when a *pro se* ineffective assistance of counsel claim is presented, the trial court must conduct a preliminary inquiry to determine the factual basis of the claim. See *Krankel*, 102 Ill. 2d at 187-89. If the court determines the claim lacks merit or pertains only to matters of trial strategy, it is not required to appoint new counsel and may deny defendant's *pro se* motion. *People v. Jolly*, 2014 IL 117142, ¶ 29. This initial inquiry can involve a discussion of the allegations with the defendant or an "interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation." (Internal quotation marks omitted.) *Ayres*, 2017 IL 120071, ¶ 12. Such an interchange "is permissible and usually necessary in assessing what further action, if any, is warranted on a defendant's claim." (Internal quotation marks omitted.) *Jolly*, 2014 IL 117142, ¶ 30. In addition to those methods, the court may consider the defendant's *pro se* allegations of

ineffectiveness of counsel based on the court's own knowledge of defense counsel's performance at trial. *Id.*; *People v. Moore*, 207 Ill. 2d 68, 79 (2003).

¶ 37 Second, if the allegations reveal possible neglect of the case, new counsel is appointed to represent the defendant in a full hearing on the claim of the ineffectiveness of original counsel. *People v. Villanueva*, 2017 IL App (3d) 150036, ¶ 46. Whether a defendant was entitled to a *Krankel* hearing is a legal question that is reviewed *de novo*. *People v. Jackson*, 2016 IL App (1st) 133741, ¶ 68.

¶ 38 "[W]hen a defendant brings a clear claim asserting ineffective assistance of counsel, either orally or in writing, this is sufficient to trigger the trial court's duty to conduct a *Krankel* inquiry." *Ayres*, 2017 IL 120071, ¶ 18. The defendant need only bring his or her posttrial ineffective assistance of counsel claim to the trial court's attention, and the claim need not be supported by facts or specific examples. *Id.* ¶¶ 19, 22 (finding the defendant's *pro se* posttrial petition stating "ineffective assistance of counsel" without additional facts or argument sufficient to trigger a *Krankel* inquiry). "[T]he primary purpose of the preliminary inquiry is to give the defendant an opportunity to flesh out his claim of ineffective assistance so the court can determine whether appointment of new counsel is necessary." *Id.* ¶ 20.

¶ 39 Here, we consider whether such preliminary inquiry is mandated when a bare claim of the ineffective assistance of counsel is raised in a motion submitted by defense counsel, rather than raised *pro se* by a defendant. Defendant acknowledges the considerable line of supreme court precedent that has applied the requirement of a *Krankel* inquiry only in the context of *pro se* claims of ineffective assistance of counsel. See *People v. Bates*, 2018 IL App (4th) 160255, ¶¶ 101-02 (citing *Ayres*, *Patrick*, *Jolly*, *Moore*, *Krankel*, and other supreme court decisions involving *pro se* claims and stating, "The Illinois Supreme Court has never held that a *Krankel* hearing may be triggered by a defense counsel's representations in the absence of the defendant's *pro se* motion raising a claim of ineffective assistance of counsel ***."); see also *People v. McGath*, 2017 IL App (4th) 150608, ¶¶ 49, 51-52 (rejecting the defendant's argument that the trial court should have conducted a *Krankel* inquiry into defense counsel's own ineffectiveness claim because *Krankel* and its progeny "apply *only* to posttrial claims raised by a defendant *pro se*" (emphasis in original)).

¶ 40 However, defendant maintains the supreme court in those cases did not expressly limit *Krankel* to *pro se* contentions. In arguing the trial court is required to hold a *Krankel* hearing whenever an allegation of ineffective counsel is raised, defendant cites to two First District cases, *People v. Willis*, 2013 IL App (1st) 110233, and *People v. Hayes*, 229 Ill. App. 3d 55 (1992). We find these cases distinguishable.

¶ 41 *Willis* involved a posttrial motion filed by trial counsel for a minor defendant tried in adult court in which counsel alleged, *inter alia*, his own ineffective assistance for failing " 'to use due diligence to insure' " a particular witness would be available to testify at trial rather than by stipulation. *Willis*, 2013 IL App (1st) 110233, ¶ 62. Counsel stated that the witness's live testimony was "material" to counsel's trial strategy, the stipulation was insufficient to satisfy this strategy, and the defendant was prejudiced because the jury did not hear the live testimony. *Id.* After defense counsel described the alleged error, the State noted defense counsel's allegation might raise a conflict of interest. *Id.* When the court asked the State if it wanted to file a motion to disqualify defense counsel, defense counsel struck the ineffective assistance claim from the motion. *Id.* Neither counsel nor defendant raised the claim again. On appeal,

the defendant argued the trial court erred in not inquiring into counsel's allegation of ineffectiveness under *Krankel*. *Id.* ¶ 74.

¶ 42     This court agreed, remanding for the limited purpose of an "adequate inquiry" by the court into the claim of ineffective assistance of counsel. *Id.* In so holding, this court called the facts "unusual" in that defense counsel raised his own ineffectiveness and later changed his mind and withdrew the allegation; the court further noted the defendant was a minor at the time of trial. *Id.* ¶ 69. The court rejected the State's suggestion that the defendant should have objected to counsel's withdrawal of the issue or made clear in some other manner that he was dissatisfied with counsel's performance, holding:

> "Given that [the defendant] was a minor at the time of his trial, we cannot reasonably expect him to raise the issue of his trial counsel's ineffective assistance on his own. A juvenile would be expected to be more at the mercy of counsel than an adult, and less likely to be cognizant and aware of his legal rights." *Id.* ¶ 70.

The court thereafter referred to counsel's ineffectiveness claims as "*[defendant's]* allegation of ineffective assistance as raised by his trial counsel." (Emphasis added.) *Id.* ¶ 73.

¶ 43     To the extent our court held in *Willis* that even an attorney can trigger a preliminary *Krankel* inquiry, we find neither of the bases for that determination apply in the case at bar. First, unlike trial counsel in *Willis*, counsel here did not admit he was ineffective, let alone set forth the specifics of that ineffectiveness and the resulting prejudice to his client. Rather, counsel made a single, perfunctory mention of ineffective assistance in his posttrial motion and never raised it again. Second, and more importantly, defendant here was not a minor at the time of trial. The crux of *Willis* was that the defendant was a juvenile, "more at the mercy of counsel than an adult, and less likely to be cognizant and aware of his legal rights." *Id.* ¶ 70. Thus, this court did not "reasonably expect him to raise the issue of his trial counsel's ineffective assistance on his own." *Id.* Defendant was an adult well able to raise his own ineffective assistance of counsel claim. Accordingly, we find *Willis* is distinguishable. See also *Bates*, 2018 IL App (4th) 160255, ¶¶ 103-04 (distinguishing *Willis* on the same bases).

¶ 44     Defendant also relies on *Hayes*. There, the defendant was convicted of murdering his seven-year-old son, and the trial court found he was not insane at the time of the offense. *Hayes*, 229 Ill. App. 3d at 60. In a posttrial motion, defense counsel stated the standard of proof for insanity was " 'very, very, very, very confusing.' " *Id.* Counsel admitted he had been mistaken in believing the State was required to prove the defendant's mental incompetence and, as a result, he had not presented readily available evidence regarding the defendant's mental condition. *Id.* at 61. Counsel then summarized the evidence he would have presented. *Id.* Although the trial court denied defense counsel's motion for a new trial, the court stated it was "very troubled by the way the defense tried the case" and by counsel's argument in favor of the motion. *Id.* at 60. The trial court stated that, although the case may have been " 'tried in an incompetent manner,' " it would grant a new trial only based on a mistake of law or newly discovered evidence and found that the incompetence of counsel was not a reason for a new trial. *Id.*

¶ 45     On appeal, after holding defense counsel was ineffective for misunderstanding the relevant burden of proof, this court stated the trial court "should have at least inquired into the possibility" of an actual conflict where defendant's privately retained counsel argued his own incompetence. *Id.* at 64-65. We explained that, where the trial court sees incompetence of counsel and that incompetence is related to an insanity issue, "where defendant obviously does

not understand what is happening, the trial court must step in to protect defendant." *Id.* at 65. This court found further inquiry was warranted because the trial court did recognize possible neglect of the defendant's case, expressing its displeasure with counsel's representation, and "further inquiry would have revealed that it was necessary for the trial judge to step in to protect defendant." *Id.*

¶ 46 *Hayes* does not set forth a rule that a preliminary *Krankel* inquiry is always required when, as here, defense counsel makes an undeveloped, cursory claim of ineffectiveness. In fact, *Hayes* does not address *Krankel* or cite to the case at all, as defendant did not raise a *Krankel* claim on appeal. Rather, *Hayes* was decided in the context of the defendant's right to conflict-free counsel and the trial court's duty to take action when it sees incompetence by counsel. See *id.* at 64-65. *Hayes* concluded that the trial court should have inquired into the possibility of actual conflict based on counsel's admission that he misunderstood the law regarding the insanity defense and the impact this had on the evidence he presented in the defendant's case. *Id.* at 65. But the reason for the inquiry was not merely because counsel raised an ineffective assistance claim. Rather, the inquiry was required to determine whether "it was necessary for the trial judge to step in to protect" the defendant given that the ineffective assistance related to the defendant's sanity and the defendant might not understand what was happening or recognize neglect of his case. *Id.* These circumstances do not apply here, where counsel did not demonstrate his ineffectiveness and defendant was capable of understanding the proceedings. Thus, *Hayes* is distinguishable.

¶ 47 Here, defense counsel's written motion included a bare claim that defendant was "denied effective assistance of counsel," counsel did not refer to that claim in arguing the motion nor demonstrate to the trial court that his representation of defendant was deficient, and defendant was capable of raising an ineffective assistance of counsel claim *pro se*. Given the facts of this case, we find that the trial court was not required to initiate a *Krankel* inquiry into defense counsel's performance.

¶ 48 Defendant's remaining contention on appeal is that his seven-year prison sentence is excessive. He claims his sentence is disproportionate to the nature of the offense of firearm possession, where his actions did not threaten harm to anyone. He also points out that he has no prior violent criminal history, and he contends the sentence fails to adequately account for his rehabilitative potential. He requests that we vacate his sentence and remand for a new sentencing hearing or reduce his sentence to the six-year statutory minimum.

¶ 49 The Illinois Constitution provides that penalties are to be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship. Ill. Const. 1970, art. I, § 11; *People v. Perruquet*, 68 Ill. 2d 149, 154-55 (1977). A sentence must be based on the particular circumstances of each case and depends on many factors, including the defendant's criminal history, the defendant's potential for reform, and the need to protect the public and provide a deterrent to crime. *People v. Saldivar*, 113 Ill. 2d 256, 268-69 (1986); *Perruquet*, 68 Ill. 2d at 154; *People v. Wilson*, 257 Ill. App. 3d 670, 704-05 (1993).

¶ 50 The trial court has broad discretion to impose a sentence; a sentence that is within statutory limits is presumed proper and is reviewed for an abuse of that discretion. *People v. Contursi*, 2019 IL App (1st) 162894, ¶ 23; *People v. Branch*, 2018 IL App (1st) 150026, ¶ 34. In imposing sentence, the court must weigh both aggravating and mitigating factors. See 730 ILCS 5/5-5-3.1, 5-5-3.2 (West 2014). Relevant sentencing factors include the defendant's demeanor, credibility, social environment, age, mentality, and moral character. *People v.*

*Snyder*, 2011 IL 111382, ¶ 36. Because the trial court has personally observed the defendant and the proceedings, that court is in the best position to determine an appropriate sentence. *People v. Alexander*, 239 Ill. 2d 205, 212-13 (2010). This court will not substitute its judgment for that of the trial court merely because we would have weighed the sentencing factors differently. *People v. Charles*, 2018 IL App (1st) 153625, ¶ 46. We will alter a sentence only when it varies greatly from the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *Contursi*, 2019 IL App (1st) 162894, ¶ 23 (citing *Snyder*, 2011 IL 111382, ¶ 36).

¶ 51 Defendant was convicted of being an armed habitual criminal, which is a Class X felony subject to a sentencing range of 6 to 30 years in prison. 720 ILCS 5/24-1.7(b) (West 2014); 730 ILCS 5/5-4.5-25(a) (West 2014). The trial court sentenced defendant to seven years. As defendant acknowledges, his sentence was within the applicable range and thus presumed proper. See *Contursi*, 2019 IL App (1st) 162894, ¶ 23. Indeed, the trial court imposed a term only one year greater than the minimum possible sentence.

¶ 52 Nevertheless, defendant argues the sentence was excessive because his armed habitual criminal conviction was based on the act of "simple firearm possession," and he did not cause or threaten harm to anyone or use the firearm dangerously. The purpose of the armed habitual criminal statute is "to help protect the public from the threat of violence that arises when *repeat offenders* possess firearms." (Emphasis added.) *People v. Johnson*, 2015 IL App (1st) 133663, ¶ 27. Defendant is such a repeat offender. Although, as he points out, "many Illinois citizens" lawfully possess firearms, defendant had a criminal record, did not have a FOID card, and was not legally in possession of the firearm, which, given his attempt to dispose of the weapon, he was well aware of. His knowing possession of a prohibited weapon as a repeat offender with qualifying prior convictions warranted a sentence one year over the minimum.

¶ 53 Defendant contends that his seven-year sentence does not reflect his rehabilitative potential. He notes his gainful employment at the time of his arrest and while he was out on bond and his family support. Defendant points out he did not incur further criminal charges while on bond awaiting trial and had a job and stable housing waiting for him upon his release from prison. He also points out the prior convictions underlying the armed habitual criminal conviction were for nonviolent drug crimes that occurred more than 10 years ago.

¶ 54 The record establishes defense counsel made these same arguments to the trial court at sentencing, and the presentence investigation report reflected defendant's mother's support for her son, his work history before and after his arrest, and his criminal history. When such factors have been presented to the trial court, it is presumed the court considered those factors, absent some indication to the contrary. *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 19.

¶ 55 There is no such indication here. Although the court did not specifically address defendant's rehabilitative potential, it is not required to recite or assign a value to each factor in mitigation or aggravation that forms part of the record. *People v. Daniel*, 2014 IL App (1st) 121171, ¶ 41. Further, the most important factor in sentencing is the seriousness of the offense. See *Alexander*, 239 Ill. 2d at 214. Thus, the court was not required to give greater weight to mitigating factors than to the severity of the offense, and the presence of mitigating factors did not require it to impose a minimum term *Id.*; *People v. Vega*, 2018 IL App (1st) 160619, ¶ 68. Lastly, in pronouncing the seven-year sentence, the trial court noted that defendant's criminal history was "narcotics-related," thus recognizing his prior convictions were for nonviolent

offenses. We conclude the court did not abuse its discretion in imposing a sentence that was one year longer than the minimum term.

¶ 56 In summary, the evidence at trial established defendant's actual possession of the firearm that police recovered from the sidewalk. Because defendant did not raise a *pro se* claim of his counsel's ineffectiveness, the trial court was not required to conduct a *Krankel* inquiry. Defendant's seven-year sentence did not constitute an abuse of the trial court's discretion. Accordingly, the judgment of the trial court is affirmed.

¶ 57 Affirmed.