2023 IL App (1st) 211496-U

No. 1-21-1496

Order filed March 29, 2023

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 14349 |
| | ) | |
| DEANDRE ADAMS, | ) | Honorable |
| | ) | Michael R. Clancy, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE D.B. WALKER delivered the judgment of the court.
Presiding Justice McBride and Justice Burke concurred in the judgment.

**ORDER**

¶ 1   *Held*:   We affirm defendant's conviction for unlawful use or possession of a weapon by a felon over his challenge to the sufficiency of the evidence that he constructively possessed the firearm.

¶ 2   Following a bench trial, defendant Deandre Adams was found guilty of two counts of unlawful use or possession of a firearm by a felon (UUWF), four counts of aggravated unlawful use of a weapon (AUUW), and one count of violating the Firearm Owners Identification (FOID) Card Act. At sentencing, the trial court merged all counts into count I for UUWF (720 ILCS 5/24-

1.1(a) (West 2018)), and sentenced defendant to three years in prison. On appeal, defendant contends that he was not proven guilty of UUWF beyond a reasonable doubt when a police officer's testimony detailing suspicious movement in a vehicle was "belied" by a video recording and nothing, other than the firearm's location under defendant's seat, connected the firearm to him. We affirm.

¶ 3     At trial, Chicago Police Officer Khaled Hasan testified that around 6:22 p.m. on September 8, 2018, he and Officer Tohatan were on patrol in a marked squad car.[1] Hasan sat in the front passenger seat. At the intersection of Albany Avenue and Polk Street, he observed a black Chevy Malibu fail to stop at a stop sign. The officers curbed the vehicle. At this point, Hasan was directly behind the Chevy, which had "slightly" tinted rear windows and two occupants. Hasan observed the occupants "kneeling forward" with their shoulder blades at a downward angle and their upper bodies bent down.

¶ 4     Tohatan said, "hands up," and the officers approached the vehicle. Hasan was on the passenger side of the Chevy, and observed defendant, whom he identified in court, in the driver's seat. He also detected a strong odor of cannabis coming from the vehicle. Defendant complied with Tohatan's requests to lower the vehicle's windows, raise his hands, and exit the vehicle. Defendant was taken to the front of the squad car. At the same time, Hasan asked the passenger, later identified as Anthony White, to exit. White handed Hasan a bag containing suspected cannabis, and Hasan took White into custody.

¶ 5     Once the Chevy was empty, Hasan searched it. He recovered a black steel Glock 22 from underneath the front passenger seat, and a two-tone 9-milimeter Smith & Wesson from underneath

_____

[1] The transcript does not contain Officer Tohatan's given name.

the driver's seat. The Smith & Wesson, which was loaded and measured six or seven inches, was within arm's reach of where defendant was seated. It was not in a container or secured, and would have been able to shift about the vehicle. Hasan asked defendant whether he had a FOID card or concealed carry license (CCL), but defendant did not present either one.

¶ 6     Hasan wore a body camera during the incident. The State admitted and published the footage, which is included in the record on appeal and has been viewed by this court. The first 29 seconds of the video depict the dashboard of the squad car, the sky, and the upper levels of buildings. The weather is overcast, but there is ambient light and good visibility. At the 30-second mark, the squad car stops. The first view of a black vehicle is at 39 seconds. The officers exit their vehicle and approach the black vehicle at a measured pace. As Hasan approaches the passenger side, a voice states, "all the windows down." Tohatan approaches the driver's side shining a flashlight inside. The windows lower, and an arm in a black sleeve emerges from the passenger side window.

¶ 7     As Hasan stands next to the vehicle, the footage depicts the occupants' hands and laps, and a flashlight beam on defendant's lap. The occupants and officers speak, but most of the conversation is inaudible due to the volume of Hasan's police radio. However, a voice says "barbershop" and Hasan says, "smell" and "don't know *** is coming." Defendant exits the vehicle. Hasan asks White to place his phone on the dash and whether he has "anything on ya." White hands Hasan something that crinkles. White is taken into custody and placed at the front of the squad car with defendant and Tohatan while Hasan returns to the Chevy.

¶ 8     Hasan first searches the passenger side. He states, "it's a Glock hanging out," and moves his body camera to reveal a firearm under the passenger seat with its butt facing the camera. Hasan

takes the firearm and removes the clip. He asks whether there is "anything else," and mutters, "gonna play the dumb game." Next, Hasan searches the glove box and center console. He asks for a FOID card or CCL, but neither is produced. Hasan then moves to the driver's side of the Chevy, kneels, sighs, and says, "get the f*** outta here" and "got another piece." He sighs again, removes his body camera, and uses a flashlight to illuminate a firearm and water bottle under the seat. He identifies the firearm as a Smith & Wesson. He pushes his hand underneath the seat, catching his watch briefly against the bottom of the seat, to retrieve the firearm. Hasan asks, "what the f*** are you guys doing?" and searches the backseat. He then asks, "you usually carry like this when you go to the barber shop?" and states that there are "two guns, bro."

¶ 9    At trial, Hasan explained that the body camera footage did not depict the movements that he observed inside the Chevy prior to exiting the squad car because the camera's position on his chest provided a different vantage point than his head. He recovered the firearm from the same location that he observed defendant making movements.

¶ 10    During cross-examination, Hasan acknowledged that defendant pulled over immediately, and that Hasan was 5 to 10 feet away when he saw movement inside the Chevy. Trial counsel then asked Hasan to review the body camera footage and asked him to define "slight tint." Hasan replied that, "the camera show[ed] it differently, based on reflection," but that "out there it was much lighter than that." He agreed that the back window's tint was darker than a "normal vehicle" and that the weather was cloudy on the day of the incident. However, there was "some sort of sunlight." While speaking with defendant and White, Hasan did not discuss the movements that he observed them making.

¶ 11    While Hasan stood next to the Chevy prior to ordering its occupants out, he did not see defendant fidgeting or making further movements. Hasan never saw anything in defendant's hand. The firearm under the driver's seat was located in an open space. There was also an empty water bottle and gum wrappers. Defendant provided a driver's license and proof of insurance. Hasan acknowledged that his arrest report did not include information that defendant moved toward the area from which the firearm was recovered. He explained that arrest reports require the author to state which elements of an offense took place or the offense that a defendant will be charged with, but that the case incident report was "more descriptive."

¶ 12    During redirect, Hasan testified that he searched the vehicle, beginning on the passenger side, due to the smell of cannabis. He first searched the area where he saw the passenger make furtive movements, then did the same on the driver's side. He documented the movements in the case incident report and reiterated that not every detail is included in an arrest report. After observing the firearm under the driver's seat, he removed his body camera to film a "clearer image."

¶ 13    The State admitted certified abstracts from the Illinois State Police Firearms Services Bureau that showed that defendant did not have a valid FOID card or CCL prior to October 25, 2018. The State also admitted certified copies of defendant's convictions for residential burglary in case numbers 09 CF 1335 and 09 CF 2193.

¶ 14    In closing argument, the State asserted that the evidence established that defendant, a convicted felon without a FOID card or CCL, constructively possessed the firearm recovered from under his seat. Hasan observed defendant making a forward motion toward defendant's feet, and while the body camera footage did not capture these movements, cameras are "not used to replace

the eyes." The defense replied that there was no testimony as to the Chevy's owner, the windows were tinted, and the movements were not dispositive. According to counsel, Hasan "maybe" saw shadows, but "who knows" exactly what defendant "was doing when his shoulders moved." The defense further argued that the firearm under the driver's seat was not "right there" and the State had not established that defendant knew "exactly what" was under the seat.

¶ 15    In finding defendant guilty, the trial court found Hasan credible and straightforward. The court noted that while Hasan did not include details about the movement in the arrest report, he included them in the case incident report. The court stated that its review of the footage demonstrated that visibility through the windows depended on the angle. Moreover, the officers' actions comported with seeing the movements Hasan described. Specifically, the officers did not approach the Chevy until all the windows were lowered, which was consistent with a concern that the vehicle's occupants might be armed. In other words, the officers were on "high alert." The court found that defendant had exclusive control over the firearm that was directly below him, and that the "furtive movement" led to the reasonable inference that defendant was secreting a firearm because the police were behind him.

¶ 16    Defendant filed a motion to reconsider, or, in the alternative for a new trial, arguing in pertinent part that the window tint rendered Hasan's testimony that he saw the movements "impossible." The trial court denied the motion, as the body camera footage showed that the officers believed that defendant hid a weapon, and that the location from which the firearm was recovered led to the reasonable inference that the movements were, in fact, defendant hiding it.

¶ 17    After argument, the trial court merged all counts into count I for UUWF and sentenced defendant to three years in prison. Defendant did not file a motion to reconsider sentence.

¶ 18     On appeal, defendant contends that the evidence was insufficient to establish that he possessed a firearm when Hasan's "claims" of suspicious movement were belied by the body camera footage and the only connection between defendant and the firearm was its location, "buried deeply" under his seat.

¶ 19     In reviewing a challenge to the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the crime proven beyond a reasonable doubt. *People v. Cline*, 2022 IL 126383, ¶ 25. The trier of fact is responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from the facts presented at trial. *People v. McLaurin*, 2020 IL 124563, ¶ 22. "In reviewing the evidence, this court will not retry the defendant, nor will we substitute our judgment for that of the trier of fact." *Id*. A defendant's conviction will be reversed only when the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of his guilt. *People v. Newton*, 2018 IL 122958, ¶ 24.

¶ 20     Here, defendant was charged with UUWF in that he knowingly possessed a firearm after having previously been convicted of a felony (count I). See 720 ILCS 5/24-1.1(a) (West 2018). Thus, the State was required to prove defendant's possession of the firearm beyond a reasonable doubt.

¶ 21     A defendant's possession of contraband is a factual issue, and we will not disturb the findings of the trial court unless the evidence is so unbelievable that it creates a reasonable doubt as to his guilt. *People v. Jones*, 2019 IL App (1st) 170478, ¶ 27. Possession of contraband may be actual or constructive. *Id.* Here, because defendant was not found in actual possession of the firearm, the State was required to prove that he constructively possessed it.

¶ 22 To establish constructive possession, the State must prove that the defendant had knowledge of the contraband and exercised immediate and exclusive control over the area where the contraband was found. *People v. Wise*, 2021 IL 125392, ¶ 25; see also *People v. Givens*, 237 Ill. 2d 311, 335-36 (2010) (the presence of other people does not diminish a defendant's exclusive dominion and control). Constructive possession is often proven entirely by circumstantial evidence. *People v. McCarter*, 339 Ill. App. 3d 876, 879 (2003). "Knowledge may be shown by evidence of a defendant's acts, declarations, or conduct from which it can be inferred that he knew the contraband existed in the place where it was found." *People v. Spencer*, 2012 IL App (1st) 102094, ¶ 17. Knowledge may also be demonstrated by a defendant's statements or conduct upon encountering the police. *People v. Thomas*, 2019 IL App (1st) 162791, ¶ 27. "Control is established when a person has the 'intent and capability to maintain control and dominion' over an item, even if he lacks personal present dominion over it." *Spencer*, 2012 IL App (1st) 102094, ¶ 17 (quoting *People v. Frieberg*, 147 Ill. 2d 326, 361 (1992)). Here, defendant's sole contention on appeal is that the evidence was insufficient to establish that he constructively possessed the firearm recovered from underneath the driver's seat of the Chevy.

¶ 23 A defendant's presence in a vehicle is not alone sufficient evidence that he knows a weapon is therein. *People v. Bailey*, 333 Ill. App. 3d 888, 891 (2002). Factors relevant to a defendant's knowledge include (1) whether the weapon was visible to the defendant, (2) the time in which the defendant would have been able to observe the weapon, (3) whether the defendant made any gestures indicating an effort to hide or retrieve the weapon, (4) the weapon's size, and (5) whether the defendant had a possessory or ownership interest in the vehicle or the weapon found inside.

*Bailey*, 333 Ill. App. 3d at 891-92. Generally, knowledge and possession are factual questions to be resolved by the trier of fact. *People v. Smith*, 2015 IL App (1st) 132176, ¶ 25.

¶ 24    Here, taking the evidence in the light most favorable to the State, a rational trier of fact could have found that defendant constructively possessed the firearm recovered from beneath the driver's seat. The evidence at trial established that, while directly behind the Chevy, Hasan observed the occupants "kneeling forward" with their shoulder blades pointed in a downward angle and their upper bodies bent down. Hasan acknowledged that the Chevy's windows were tinted, but asserted that the "slightly" tinted windows did not prevent him from seeing movement inside the vehicle and that his line of sight had a different vantage point than the body camera. Defendant argues that the body camera footage "belies" Hasan's testimony regarding the movement that Hasan observed, but the footage does not capture the moments when the movement was allegedly seen and therefore is not in conflict with the testimony. The footage, filmed on the camera resting at Hasan's chest level, depicts the inside of the squad car, the sky, and buildings. Body camera footage does depict defendant in the Chevy's driver's seat, defendant exiting the vehicle, and the recovery of a firearm from underneath that seat.

¶ 25    Accordingly, the circumstantial evidence showed defendant's "intent and capability" to exercise dominion over the area where the firearm was found. See *People v. Jackson*, 2019 IL App (1st) 161745, ¶ 27. "[D]irect evidence of a defendant driving a vehicle is surely sufficient evidence of control." *People v. Bogan*, 2017 IL App (3d) 150156, ¶ 42. Here, defendant drove the vehicle, demonstrating he had control over the area where the firearm was recovered. *Id*. Moreover, the firearm was loose under the driver's seat, within reach of the person in that seat. The body camera footage depicted the firearm and a water bottle under the seat, and Hasan could reach under the

seat, from outside the vehicle, to retrieve it. When the firearm was loose under the seat in which defendant sat, a trier of fact could reasonably infer the firearm was in his immediate and exclusive control. See *People v. Grant*, 339 Ill. App. 3d 792, 799 (2003) ("Because of the location of the gun at the time it was recovered, we can certainly infer that defendant had knowledge of the gun and that the gun was within his immediate and exclusive control."). Moreover, defendant's actions of moving his body downward while the Chevy was being curbed by police officers supports the inference that he had knowledge of the firearm underneath this seat. See *Thomas*, 2019 IL App (1st) 162791, ¶ 27 (knowledge may be inferred from the defendant's statements or conduct upon encountering the police).

¶ 26　We are unpersuaded by defendant's reliance on *Bailey*. In that case, the defendant was sitting in the front passenger seat of a vehicle being driven by someone else. *Bailey*, 333 Ill. App. 3d at 889. Officers stopped the vehicle and, after observing an open container of alcohol, ordered the occupants out. *Id*. at 889-90. Following a search, the police recovered a firearm from under the front passenger seat of the vehicle. *Id.* at 890. The firearm was not visible until police looked under the seat. *Id.* The defendant was ultimately convicted of AUUW. *Id.*

¶ 27　On appeal, however, the court found no "affirmative evidence, either circumstantial or direct," to establish that the defendant had knowledge of the firearm under his seat. *Id*. at 892. The firearm was under the seat and not visible, the defendant did not own the vehicle, officers did not see the defendant make gestures indicating he was trying to retrieve the firearm, and there was no connection between the owners of the vehicle and firearm and the defendant. *Id.*

¶ 28　We find *Bailey* distinguishable. While defendant is correct that his mere presence in the Chevy, without more, is not evidence that he had knowledge of the firearm (*id*. at 891), as

discussed, the circumstantial evidence here was sufficient to establish his constructive possession. Unlike the defendant in *Bailey*, who was a passenger in a vehicle with another person driving and a firearm was recovered from under Bailey's seat, here, defendant was driving and the firearm was recovered from under his seat. Moreover, unlike the *Bailey* defendant, when defendant came into contact with police officers, he was observed angling his body downward.

¶ 29 Defendant contends that the tinted windows "blocked" the officers' view of the occupants, since the officers required that the windows be lowered before approaching the Chevy. He argues that it would have been "extremely difficult, if not impossible" for Hasan to observe any movement by the Chevy's occupants and argues that the lack of discussion about the furtive movements on the body camera footage means that no such movement took place. He likens Hasan's recitation of events to so-called "dropsy" testimony, where an officer is alleged to have fabricated evidence that a defendant dropped contraband in plain view in order to avoid the exclusion of improperly obtained evidence. See, *e.g.*, *People v. Campbell*, 2019 IL App (1st) 161640, ¶ 20.

¶ 30 Here, Hasan acknowledged that the Chevy's windows were tinted, but asserted that the tint was slight and there was enough sunlight to see the occupants' movements. Although defendant posits that the tint motivated the officers to approach slowly, another reasonable inference is a concern, based upon the movements Hasan observed, that the occupants of the Chevy had hidden contraband under the seats. The body camera footage depicts the officers approach the Chevy at a measured pace from the sides, moving closer once the windows were down. While there is no explicit discussion of the movements on the body camera footage, Hasan testified that he included this information in the case incident report.

¶ 31 Defendant's allegation that police officers frequently fabricate "dropsy" testimony does not show that the evidence in this case (*i.e.*, that Hasan observed the Chevy's occupants move their bodies at a downward angle toward their seats, and that firearms were later recovered from under those seats) was so improbable or incredible that it created a reasonable doubt of his guilt. See *People v. Henderson*, 33 Ill. 2d 225, 229 (1965) ("Far from being contrary to human experience, cases which have come to this court show it to be a common behavior pattern for individuals [possessing contraband] to attempt to dispose of [it] when suddenly confronted by authorities.").

¶ 32 Defendant further argues that no physical evidence, such as DNA or fingerprints, linked him to the firearm, no evidence established that he owned the Chevy, and he did not make a written or videotaped statement. However, as previously noted, circumstantial evidence alone is sufficient to sustain a conviction. See *McCarter*, 339 Ill. App. 3d at 879 (a defendant's constructive possession of contraband is often proven entirely by circumstantial evidence). "Physical evidence linking defendant with the firearm is not required to establish that he committed the offense." *People v. Bobo*, 2020 IL App (1st) 182628, ¶ 43.

¶ 33 In the case at bar, defendant was initially observed making movements toward the area under the driver's seat and a firearm was later recovered from under that seat. These facts support a reasonable inference that defendant knew a firearm was underneath his seat. While defendant is correct that no evidence at trial established the Chevy's ownership, he relies on no authority requiring the State to establish that he owned the vehicle in order to prove his possession of contraband found therein. The fact that the Chevy's owner was not identified at trial was not fatal to the State's case when defendant was driving the Chevy at the time of the traffic stop. See *Bogan*, 2017 IL App (3d) 150156, ¶ 42 ("direct evidence of a defendant driving a vehicle is surely

sufficient evidence of control"). The fact that the record does not establish whether defendant owned the Chevy does not negate his control over the area where the firearm was found, directly under his seat. See *People v. Chavez*, 327 Ill App. 3d 18, 26 (2001) (when contraband is found in a vehicle, "it is control of the vehicle rather than ownership of the vehicle which is pertinent to proof of control of the area" where the contraband is located).

¶ 34    Accordingly, viewing the evidence in the light most favorable to the State, we cannot say that no rational trier of fact could have concluded that the evidence established that defendant constructively possessed the firearm recovered from underneath the driver's seat of the Chevy, the seat in which he was sitting. We reverse a defendant's conviction only when the evidence is so unreasonable, improbable, or unsatisfactory that reasonable doubt of his guilt remains (*Newton*, 2018 IL 122958, ¶ 24); this is not one of those cases. Defendant's conviction for UUWF is therefore affirmed.

¶ 35    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 36    Affirmed.